572 P.2d 943

**In the Matter of the Consolidated Protests of Valuation of Property for Property Taxation Purposes of, CUTTER FLYING SERVICE, INC., Southwest Air Rangers, Inc., Frontier Airlines, Inc., Continental Airlines, Inc., Trans World Airlines, Inc., and Texas International Airlines, Inc., Protestants-Appellants,**

v.

**PROPERTY TAX DEPARTMENT of the State of New Mexico, Valuation Authority-Appellee.**

No. 2773.

Court of Appeals of New Mexico.

Aug. 30, 1977.

Thomas F. Keleher, Keleher & McLeod, Albuquerque, for Cutter.

Peter J. Adang and Jeffrey W. Loubet, Modrall, Sperling, Roehl, Harris & Sisk, Albuquerque, for Southwest Air Rangers.

John G. Jasper, Jasper & Buell, Santa Fe, for Frontier Continental, Trans World, and Texas International Airlines, Inc.

Toney Anaya, Atty. Gen., Santa Fe, John C. Cook and Arthur Encinias, Property Tax Dept., Asst. Attys. Gen., Santa Fe, for appellee.

## OPINION

HERNANDEZ, Judge.

This is an appeal for review of an order of the Director of the Department of Property Tax denying appellants' protest of assessment and levy of ad valorem taxes on their respective leasehold and other interests in the Albuquerque International Airport.

Appellants Continental Airlines, Inc., Trans World Airlines, Inc., Frontier Airlines, Inc., and Texas International Airlines, Inc., will be referred to collectively as "airlines." Appellants Cutter Flying Service, Inc., and Southwest Air Rangers, Inc., will be referred to as "airport operators."

Each of the airlines entered into separate agreements entitled "leases" at different times with the City of Albuquerque for the use of some of its improvements and facilities at the municipal airport. Although differing in some respects, these agreements can, for the purposes of this opinion, all be divided into five parts:

1. Areas used exclusively by the lessor airline: offices, a ticket and baggage-handling counter, and operations space.
2. Areas used jointly with other airlines: passenger gates and holding areas, baggage claim area, ground area for parking, taxiing, loading and unloading aircraft.
3. Facilities used jointly with other airlines: public address system, aircraft toilet waste disposal facility.
4. Areas in terminal building used in common with public.
5. Runways used jointly with other airlines, military and others.

The agreements of the two airport operators can be divided into three parts:

1. Space in hangar building and adjacent land used exclusively by the lessor airport operator.
2. Aircraft tiedown areas used jointly with others.

3. Collection of fees for use of runways, paid by individual users in the form of a tax on aviation fuel and oil and remitted to the city by the airport operator. Southwest Air Rangers' lease (which is more recent than Cutter's) provides that if a private plane does not purchase fuel from Southwest, "the Lessee shall immediately upon notice thereof advise the Aviation Director so that Lessor may property [sic] compute and bill necessary landing fees."

In his order, the Director made the following two pertinent conclusions of law:

"1. Taxpayers' fractional interests in the improvements located at Albuquerque International Airport are not exempt by reason of Section 72–29–2.4 NMSA 1953 (1976 Interim Supp.) of the Property Tax Code or Article VIII, Section 3 of the New Mexico Constitution.

"2. Taxpayers' fractional interests in the improvements located at Albuquerque International Airport are within the definition of 'property' found in subsection G of Section 72–28–2 NMSA 1953 (Supp.1975) of the Property Tax Code, and that taxpayers are 'owners' of those fractional interests pursuant to Subsection E of Section 72–28–2, supra."

The pertinent constitutional provisions are:

"Taxes levied upon tangible property shall be in proportion to the value thereof, and taxes shall be equal and uniform upon subjects of taxation of the same class. N.M.Const. art. 8, § 1.

"The property of the United States, the state and all counties, towns, cities and school districts, and other municipal corporations, public libraries, community ditches and all laterals thereof, all church property, all property used for educational or charitable purposes, all cemeteries not used or held for private or corporate profit, and all bonds of the state of New Mexico, and of the counties, municipalities and districts thereof shall be exempt from taxation." N.M.Const. art. 8, § 3.

The pertinent statutory provisions from the Property Tax Code, Chapter 72, Articles 28, 29, 30, and 31, N.M.S.A.1953 (Supp.1975) are: Section 72–28–2(E):

"E. 'owner' means the person in whom is vested any title to property".

Section 72–28–2(G):

"G. 'property' means tangible property, real or personal".

Section 72–29–2.2 (1976 Interim Supp.):

"As used in this section and sections 72–29–2.3 and 72–29–2.4 NMSA 1953:

"A. 'fractional interest' means a tangible interest in real property, except for mineral property as defined in section 72–29–11 NMSA 1953, that is less than the total of the interests existing in the property, but 'fractional interest' does not include those property interests described in section 72–29–2.1 NMSA 1953;

"B. 'exempt entity' means any person whose real property is exempt from taxation under the New Mexico Constitution or the Enabling Act (36 Stat. 557, as amended) by reason of ownership;

"C. 'improvements' includes surface and subsurface structures, fixtures, transmission lines, pipelines and other works . . . ."

Section 72–29–2.3 (1976 Interim Supp.):

"A. In the enactment of section 72–29–2.4 NMSA 1953, the legislature finds that:

"(1) it has legislative authority and should exercise it to impose the state's property tax on improvements owned or used by a nonexempt entity when the improvements are on the land of an exempt entity;

"(2) nonexempt entities having fractional interests in exempt real property of Indian tribes, pueblos and individuals should be treated under the law in the same manner as nonexempt entities having fractional interests in exempt real property of other exempt entities; and

"(3) for the purpose of property taxation, and only for that purpose, fractional interests are personal property

and are thus subject to exemption by the legislature under the New Mexico Constitution.

"B. In the enactment of section 72–29–2.4 NMSA 1953, it is the expressed legislative purpose that:

"(1) fractional interests of a non-exempt entity in real property of an exempt entity be exempted from property taxation subject to the limitation contained in that section  . . . ."

Section 72–29–2.4 (1976 Interim Supp.): "Fractional interests of nonexempt entities in real property of exempt entities are exempt from property taxation under the Property Tax Code  . . . . Nothing contained in this section shall affect the liability for tax of improvements located upon the real property of exempt entities."

The appellants allege seven points of error. Their first point, which is dispositive of this appeal, reads as follows:

"The interests of the taxpayers in the Albuquerque International Airport are not subject to valuation for property taxation purposes and the actions of the Director of the Department in valuing the interests for property taxation was contrary to law."

As a preliminary matter it is necessary to determine the nature of the interests created by the agreements between the appellants individually and the City of Albuquerque. The applicable law is as follows:

"[A] lease is an agreement under which the owner gives up the possession and use of his property for a valuable consideration and for a definite term." *Transamerica Leasing Corp. v. Bureau of Revenue*, 80 N.M. 48, 450 P.2d 934 (Ct.App. 1969).

3 Thompson on Real Property § 1031 at 97–98:

"The relation of landlord and tenant cannot be inferred as a matter of law from the mere fact of lawful occupancy. The tenant must acquire some definite control and possession of the premises." See, *Chavez v. Torlina*, 15 N.M. 53, 99 P. 690 (1909).

"It is said that the difference between a license and a lease is that a lease gives to the tenant the right of possession against the world, while a license creates no interest in the land, but it is simply the authority or power to use it in some specific way." Thompson, supra, § 1032 at 106.

"A lease is a separation of the entire group of possessory rights, immunities, privileges and liabilities out of the entire bundle of titular rights, privileges, immunities and liabilities and their transfer to the lessee. In this it differs from all kindred legal concepts. The tenant acquires all of the possessory interests except those which the landlord specifically reserves unto himself by express covenants in the lease." Thompson, supra, § 1032 at 109.

"A license to occupy land is in the nature of a tenancy at will; but a license confers no title or interest in the land." Thompson, supra, § 1032 at 105.

*Tidwell v. State ex rel. Herman*, 21 Ariz. App. 3, 514 P.2d 1260 (1973):

"Appellants' permit from the federal government was a mere license and gave them no estate or property right in the land [Citations omitted.] A license, being a mere permissive user, is not 'property' in a constitutional sense." See, *Board of County Com'rs. of Dona Ana County v. Sykes*, 74 N.M. 435, 394 P.2d 278 (1964).

"The character of the instrument is not to be determined by its form, but from the intention of the parties as shown by the contents of the instrument." *Transamerica Leasing Corp. v. Bureau of Revenue*, supra.

It is readily apparent from the foregoing and from a study of the agreements that the airlines acquired a leasehold interest in those areas of which they had exclusive use. They acquired a mere license to use the rest, runways, etc. Stated negatively, they

did not acquire the dominion and control necessary to constitute a leasehold as to those areas.

The airport operators likewise acquired a leasehold interest only in those areas over which they had exclusive control and a mere license to use the other areas and facilities. The airport operators had, in addition, the task of collecting fees for the city from all those using the runways except the airlines and, impliedly, the military, in the form of a tax on the gasoline and oil purchased.

■ This, then, brings us to the question of whether any or all of the interests acquired by the appellants are subject to the property tax provided for in § 72–29–3(A), N.M.S.A.1953 (Supp.1975):

"Except for the property listed in subsection B of this section, all property is subject to valuation for property taxation purposes under the Property Tax Code . . . if it has a taxable situs in the state."

(We note that all of the improvements and facilities were built by and are owned by the City of Albuquerque.) The answer as to leasehold interests is "yes": generally the leasehold interest of a nonexempt lessee in property leased from an exempt owner is taxable. See Annot. Availability of Tax-Exemption to Property Held on Lease from Exempt Owner, 54 A.L.R.3d 402 (1973). Justice Holmes, in *Trimble v. Seattle*, 231 U.S. 683, 34 S.Ct. 218, 58 L.Ed. 435 (1914), referring to the assessment of a leasehold interest in state tidelands, stated:

"If these leaseholds are not taxable, they are a favored class of property; for ordinarily leaseholds are taxed even if they are lumped and included in the value of the fee. When an interest in land, whether freehold or for years, is severed from the public domain and put into private hands, the natural implication is that it goes there with the ordinary incidents of private property, and therefore is subject to being taxed." See also, *Village of Deming v. Hosdreg Company*, 62 N.M. 18, 303 P.2d 920 (1956).

■ The grant of a license does not vest the grantee with sufficient incidents of ownership to make the grantee's interest subject to ad valorem taxation. In other words, a license, not constituting an interest in real property, does not meet the definition of a "fractional interest" set forth in § 72–29–2.2(A), supra.

■ The leasehold interests of the appellants, which do constitute fractional interests in real property, however, are specifically exempt from property taxation by the following part of § 72–29–2.4, supra: "Fractional interests of nonexempt entities in real property of exempt entities are exempt from property taxation under the Property Tax Code."

The Department argues that the Legislature, by enacting the following intended to and did impose the property tax on the appellants' interests in the improvements (as distinct from their interest in the land) at the airport:

"In the enactment of Section 72–29–2.4, N.M.S.A.1953, the legislature finds that: (1) it has legislative authority and should exercise it to impose the state's property tax on improvements owned or used by a nonexempt entity when the improvements are on the land of an exempt entity; . . ." (§ 72–29–2.3(A), supra) and the following part of § 72–29–2.4, supra: "Nothing contained in this section shall affect the liability for tax improvements located upon the real property of exempt entities."

The Department does not define what it means by the term "interests;" neither is it defined in the Property Tax Code.

■ Looking then at § 72–29–2.3(A), supra: prior to the enactment of this section, which was in 1976, any improvements owned by the appellants which were located on the land of the City of Albuquerque (of which there were none) would have been subject to the property tax by reason of § 72–29–3(A), supra, enacted in 1973. As to the right to tax appellants' use of the City's improvements, as we previously stated, their leasehold interests could be made subject to the property tax, but not the use

made under their licenses. The legislature could impose an excise tax on such a use. Excise taxes, such as occupational, license, privilege and franchise taxes, are charges for the privilege arising from the use of property, while property tax are taxes directly on property itself. *Chesapeake & Potomac Tel. Co. v. City of Morgantown*, 143 W.Va. 800, 105 S.E.2d 260 (1958).

Looking next at § 72–29–2.4, supra: the language of the first sentence is clear and unequivocal. However, the same cannot be said for the second sentence. Assuming that the improvements referred to are owned by an exempt entity, such an interpretation would have the affect of levying an unconstitutional tax upon the property of exempt entities. Although the Property Tax Code does not include a definition of "real property," it is generally understood to mean a parcel of land together with all structures, fixtures and improvements upon it. See, *Dona Ana Development Corp. v. Commissioner of Revenue*, 84 N.M. 641, 506 P.2d 798 (Ct.App.1973). Assuming that the improvements (which of necessity would have to be personal property) were owned by a nonexempt entity and used for business purposes, then they were already subject to the property tax prior to the enactment of this section by reason of § 72–30–2: "A tax is imposed upon all property subject to valuation for property taxation purposes under article 29 of Chapter 72 NMSA 1953. The tax shall be imposed at the rates authorized and in the manner and for the purposes specified in this article." The Department's interpretation requires rewriting the second sentence of § 72–29–2.4 as follows: "Nothing contained in this section shall affect the liability for tax of [*the use of*] improvements by [*nonexempt entities*] located upon the real property of exempt entities." What the intention of the legislature was, we can only speculate.

When the provisions of a statute are so vague and conflicting that we must guess as to its meaning then we have no alternative but to declare it void, *State v. Humble Oil & Refining Co.*, 55 N.M. 395,

234 P.2d 339 (1951). As Judge Seth stated in *United States v. Community T. V., Inc.*, 327 F.2d 797 (10th Cir. 1964):

"Without question, a taxing statute must describe with some certainty the transaction, service, or object to be taxed, and in the typical situation it is construed against the Government."

"A statute is void where it is so vague as to embrace acts which it is unreasonable to presume were intended to be made subject to its sanctions." *Telephone News Systems, Inc. v. Illinois Bell Telephone Co.*, 220 F.Supp. 621 (N.D.Ill. 1963), aff'd, 376 U.S. 782, 84 S.Ct. 1134, 12 L.Ed.2d 83 (1964).

Accordingly, we declare all of § 72–29–2.3, supra, and the second sentence of section 72–29–2.4 void for vagueness.

The foregoing is sufficient to dispose of this appeal. However, we feel compelled to comment upon the method of valuation used by the Department.

The procedure followed by the Department was as follows:

(1) It determined that the unexpired term of the fractional interests of the appellants was five years, although actual terms in the agreements differ.

(2) Next, it determined the annual gross sums to be paid for the unexpired terms of the agreements. In doing so, the Department included the full amount remitted to the City by the taxpayers for their leasehold interests and licenses and, in the case of the airport operators, the amounts they collected as landing fees in the form of fuel tax and passed on directly to the City. These sums were:

| | |
|---|---|
| Continental | $159,620 |
| Frontier | $ 64,399 |
| Texas International | $ 34,816 |
| TWA | $161,387 |
| Cutter | $ 63,450 |
| Southwest Air Rangers | $ 43,673 |

(3) It then determined the present value of gross sums to be paid in the future under the agreements. This was done by obtaining a capitalization rate for the entire airport and its improvements (12.1%)

and rounding that off into an interest rate (12%) that was in turn used in obtaining the present value of future gross payments to the City under the agreements. A discount factor of 3.605 was obtained from a standard table and applied to the sum paid annually to the City by each taxpayer to determine the present worth of the gross sums to be paid to the City by the taxpayers over the next five years. The resulting valuation of the taxpayers' fractional interests was as follows:

| | |
|---|---|
| Continental | $575,430 |
| Frontier | $232,158 |
| Texas International | $125,512 |
| TWA | $581,800 |
| Cutter | $228,737 |
| Southwest Air Rangers | $157,441 |

(4) The department then deducted any value attributable to exempt fractional interests (i. e., land). Land was taken as representing 23.9% of the taxpayers' total fractional interest and the value of each fractional interest was reduced accordingly. The resulting amounts were as follows:

| | |
|---|---|
| Continental | $437,902 |
| Frontier | $176,672 |
| Texas International | $ 95,515 |
| TWA | $442,750 |
| Cutter | $174,069 |
| Southwest Air Rangers | $119,813 |

These amounts were taken as the value of the taxpayers' fractional interest in improvements for taxation purposes.

For the future guidance of the Department in evaluating leasehold interests in property, we would point out that the method used is arbitrary and not in accordance with the law.

The method of determining the market value of leasehold interests is well established in the law of condemnation. § 72–29–5 of the Property Tax Code provides that the value of property for property taxation purposes shall be its "market value." The Supreme Court of the United States in *United States v. Petty Motor Co.*, 327 U.S. 372, 66 S.Ct. 596, 90 L.Ed. 729 (1946) stated the following:

"There was a complete taking of the entire interest of the tenants in the property. It has been urged that to measure just compensation for the taking of a leasehold by its value on the market or by the difference between a fair rental as of the time of taking and the agreed rent, is unfair. It is said the unfairness comes from the fact that there is really no market for leaseholds . . . We think the sounder rule under the federal statutes is to treat the condemnation of all interests in a leasehold like the condemnation of all interests in the fee.

.    .    .    .    .

"The measure of damages is the value of the use and occupancy of the leasehold for the remainder of the tenant's term, plus the value of the right to renew . . . less the agreed rent which the tenant would pay for such use and occupancy."

*Canterbury Realty Company v. Ives*, 153 Conn. 377, 216 A.2d 426 (1966):

"The value of the lease is properly arrived at, in the case of a complete taking [of the leasehold], by subtracting the rent provided for under the lease from the fair market value of the lease."

Furthermore, by including the value of all of the City's improvements in arriving at these valuations, the Department is attempting to do by indirection what it is constitutionally prohibited from doing directly, that is, taxing the City. We think there can be little doubt that, should these valuations be allowed to stand, it would have an adverse effect on the rents and fees that the City could charge in the future. And thus, ultimately, the City would bear a large part of the economic burden of the tax.

The Decision and Order of the Director is reversed.

IT IS SO ORDERED.

SUTIN, J., specially concurs.

LOPEZ, J., specially concurs in part, and dissents in part.

SUTIN, Judge (specially concurring).

I specially concur.

In 1906 Justice Holmes began a dissent as follows:

I do not suppose that civilization will come to an end whichever way this case is decided. But as the reasoning which prevails in the mind of the majority does not convince me, . . . [and as I believe that the airlines are not subject to property taxation], I think it proper to express my views. *Haddock v. Haddock*, 201 U.S. 562, 628, 26 S.Ct. 525, 551, 50 L.Ed. 867 (1906).

Prior to 1976, airlines were not subject to property taxation in their operations at the International Airport by reason of leases entered into with the City of Albuquerque.

In 1976, the legislature enacted Laws 1976, ch. 61, which created "fractional interests" in real property. As applied to airlines, the Act exempted from property taxation, "fractional interests" that the airlines held in the City's airport.

Nevertheless, based upon this Act, after hearing, the Property Tax Department Director entered "Special Order No. 470". It concluded that the taxpayers' fractional interests were subject to property taxation and evaluated for property taxation the fractional interests of the airlines as taxpayers.

I disagree because (A) taxpayers' fractional interests in the improvements are not "property" as defined, taxpayers are not "owners" of those fractional interests as defined and (B) taxpayers' fractional interests are specifically exempt from property taxation.

A. *Taxpayers' fractional interests are not "property" as defined, and taxpayers are not "owners" of fractional interests as defined.*

The Director concluded:

2. Taxpayers' fractional interests in the improvements located at Albuquerque International Airport are within the definition of "property" found in subsection G of Section 72–28–2 NMSA 1953 (Supp. 1975) of the Property Tax Code, and that taxpayers are "owners" of those fractional interests pursuant to subsection E of Section 72–28–2, *supra.*

Section 72–28–2(G) and (E) defines "property" and "owner":

G. "property" means *tangible property*, real or personal. [Emphasis added]

E. "owner" means the person in whom is vested any title to property.

Section 72–29–2.2(A) (1976 Interim Supp.) defines "fractional interest":

A. "fractional interest" means a tangible interest in *real* property . . . . . [Emphasis added]

Taxpayers' fractional interests are not tangible real property, and taxpayers are not "owners" of those fractional interests.

The buildings and runways constructed and built by the City on its land are permanent improvements on the land owned by the City. A permanent improvement becomes a part of the realty, *Bloch Pitt Invest. v. Assessor of Bernalillo Cty.,* 86 N.M. 589, 526 P.2d 183 (1974), so that real property, as used in this Act, is all inclusive and contemplates both land and improvements. *Krouser v. San Bernardino Cty.,* 29 Cal.2d 766, 178 P.2d 441 (1947); *Strobel v. Northwest G. F. Mutual Insurance Co.,* 152 N.W.2d 794 (N.D.1967). See *Dona Ana Develop. Corp. v. Commissioner of Revenue,* 84 N.M. 641, 506 P.2d 798 (Ct.App.1973).

*"Tangible Property"* means "That which may be felt or touched, and is necessarily corporeal, although it may be either real or personal." Black's Law Dictionary, at 1627 (Rev. 4th Ed. 1968). See, 73 C.J.S. Property, § 5 (1951).

*"Intangible Property"*—"Used chiefly in the law of taxation, this term means such property as has no intrinsic and marketable value, but is merely the representative or evidence of value, such as certificates of stock, bonds, promissory notes, and franchises." Black's Law Dictionary, supra, at 946. See 73 C.J.S. Property, § 5 (1951). We have held that shares of bank stock are intangible. *First State Bank of Mountainair v. State Tax Commission,* 40 N.M. 319, 59 P.2d 667 (1936).

"It is obvious of course that improvements, which regardless of who made them are nevertheless part of the real estate and are tangible property, constitute a different class of property from *the leasehold interest* which, being a contract right, theoretically is *intangible personal property*, often called a 'chattel real'". [Emphasis added] *Kentucky Tax Commission v. Jefferson Motel, Inc.*, 387 S.W.2d 293, 295 (Ky.1965).

Taxpayers' leasehold interests in the improvements are not "tangible property, real or personal". The fractional interests created by the leases are "tangible *interests* in real property". [Emphasis added]

Taxpayers are not the "owners" of fractional interests as defined. In order to be "owners" of fractional interests, taxpayers must be "vested in title to the real property." "The term 'vested,' as used in the law of property, signifies that there has been the fixation of a present right to either the immediate or future enjoyment of property." *Reese v. Reese*, 190 Md. 311, 58 A.2d 643, 647 (1948). The term "title" in real property, in common and legal speech, signifies "ownership." Restatement, Property, § 10, Note, at 28.

Any interest less than the complete ownership, such as those of a lessee for a limited period, are in the nature of a privilege or license emanating from a grant by the owner and it neither constitutes property nor gives rise to ownership. In common understanding, the person named as the owner in a deed is considered the sole owner even though the property is in the possession of someone else pursuant to a lease. Keesling, Property Taxation of Leases and Other Limited Interests, 47 Cal.L.Rev. 470 (1959).

The phrase, "vested in title to real property" means that taxpayers, as owners, have a present right to the immediate enjoyment of the realty. Are the taxpayers "owners" of the realty? The answer is "No".

New Mexico adopted a rule from Florida, that "During the life of a lease the lessee holds an outstanding leasehold estate in the premises, *which for all practical purposes is equivalent to absolute ownership*." [Emphasis added] *Tri-Bullion Corp. v. American Smelting & Refining Co.*, 58 N.M. 787, 794, 277 P.2d 293, 297 (1954). "Equivalent to ownership" means "like ownership", and "for all practical purposes", means those purposes for which the landlord-tenancy relationship was created.

When the Florida rule is traced backwards, "equivalent to ownership" means that the title to the property remains in the lessor and the possession of the lessee cannot be disturbed by the lessor. The tenant is estopped to deny the title of the landlord. The estate of the lessor during such time is limited to his reversionary interest, which ripens into perfect title at the expiration of the lease. *Rogers v. Martin*, 87 Fla. 204, 99 So. 551 (1924). *Rogers* reliance is on *Stern v. Sawyer*, 78 Vt. 5, 61 A. 36, 112 Am.St. Rep. 890, 6 Ann.Cas. 356 (1905). *Stern* holds that a lessor cannot, by a sale of a part of the property, disturb the lessee's possession and enjoyment of the premises during the term.

"Equivalent to ownership" is "like ownership" for the practical purposes of the landlord-tenancy relationship to preserve the lessee's right to possession against the whims of a lessor or his progeny. A lessee cannot commit waste, nor grant perpetual rights in the property to others, nor transfer title to the property by deed. "Equivalent to ownership" is not "ownership" in the legal sense of the word, because the title to the property, "title" meaning "ownership", remains in the lessor.

To define a lessee as being "vested in title to property", is opposed to our property tax system. It would permit all lessees as well as deed holders to be taxed on the same property. That is neither the intent of the legislature nor the Property Tax Department. No explicit provision in the Code imposes the tax liability on the "owner", but the obvious underlying assumption throughout the Code does, indeed, burden the "owner" not the lessee.

Property taxes are assessed against the *real owner* of the property, not one who is in possession thereof. The conclusion of the Property Tax Department is erroneous.

**B.** *Fractional Interests of Taxpayers are Exempt from Property Taxation.*

The Director also concluded:

1. Taxpayers' fractional interests in the improvements located at Albuquerque International Airport are not exempt by reason of Section 72–29–2.4 NMSA 1953 (1976 Interim Supp.) of the Property Tax Code or Article VII, Section 3 of the New Mexico Constitution.

The Property Tax Department relies primarily on § 72–29–2.4 (1976 Interim Supp.) to tax the fractional interests of taxpayers.

In § 72–29–2.3(B)(1), the legislature said:

B. In the enactment of section *72–29–2.4* NMSA 1953, it is the expressed legislative purpose that:

(1) *fractional interests of a nonexempt entity in real property of an exempt entity be exempted from property taxation* subject to the *limitation* contained in that section; . . . [Emphasis added]

Section 72–29–2.4 reads:

*Fractional interests of nonexempt entities in real property of exempt entities are exempt from property taxation under the Property Tax Code* . . . . Nothing contained in this section shall affect the liability for tax of improvements located upon the real property of exempt entities. [This second sentence is the limitation]. [Emphasis added]

"Exemption from taxation must be expressed in the clearest and most unambiguous language, and not left to implication or inference. (Citation omitted) Exemptions from the taxation are regarded as in derogation of the sovereign and of the common right and therefore, not to be extended beyond the exact and express requirements of the language used *strictissimi juris.*" *Territory v. B. and L. Ass'n*, 10 N.M. 337, 343, 62 P. 1097 (1900).

In conformity with the above language, § 72–29–2.4 makes fractional interests of taxpayers specifically exempt from taxation. By giving § 72–29–2.4 a literal, strict construction, whatever interests taxpayers have that can be felt or touched in the improvements are specifically exempt from property taxation.

A "fractional interest is a tangible interest in real property." What is a *tangible* interest in real property? It is an interest that can be felt or touched. The leases created a "possessory interest" in the realty and by giving some added meaning to the words, "fractional interests", we can say that "possessory interests" are "fractional interests". Whether the fractional interest is real or personal property, the legislature is authorized by Article VIII, § 3 of the New Mexico Constitution (Repl.Vol. 1, 1975 Supp.) to grant such exemptions from ad valorem taxes.

We now turn to the "limitation" placed on this exemption.

Nothing contained in this section shall affect *the liability for tax of improvements* located upon the real property. [Emphasis added]

. "Liability for tax of improvements" is meaningless. To determine what it does mean requires the dexterity of Houdini. To me, it can mean only one thing. It requires an insertion as follows:

Nothing contained in this section shall affect the liability for tax of improvements [owned or used by nonexempt entities] located upon the real property of exempt entities.

This insertion flows from the finding of the legislature set forth under § 72–29–2.-3(A)(1):

A. In the enactment of section *72–29–2.4* NMSA 1953, the legislature finds that:

(1) it has legislative authority and should exercise it to impose the state's property tax on *improvements owned or used by a nonexempt entity* when the improvements are on the land of an exempt entity; [Emphasis added]

The airlines do not "own" the improvements. They do "use" the improvements. Section 72–29–2.4 means that fractional interests of the airlines in the real property of the airport are exempt from property taxation, but improvements "used" by the airlines are not exempt from property taxation.

Perhaps, the legislature sought to overcome the rule that "Improvements affixed to the land are not separately assessable." *Bloch Pitt Invest.*, supra 86 N.M. at 591, 526 P.2d at 185. I am not, presently, concerned with the answer to that problem.

The airlines are liable for a property tax on the "use" of improvements, if the "use" is *declared* to be taxable property under the Code. A "use" of improvements is not subject to a property tax. It is subject to a "use" tax. The legislature desired to tax for "use", but it did not accomplish its purpose. It did not declare that a "use" of improvements was taxable property. It did not impose a tax on "use" of improvements, and the Property Tax Department did not assess a tax on the value of the "use". The value of being able to use a runway is not coincident with value of the runway as property. If the legislature were to tax a trucking firm for its use of New Mexico highways, the State would calculate what the cost would be for such things as maintenance, air pollution, traffic control per mile per ton. Yet the value of being able to use New Mexico highways may be far in excess of the State borne costs. It is questionable whether the State may enact a "use" tax under the guise of a "property" tax unless it declares that the "use" of improvements is subject to property taxation.

A leasehold is an estate in land less than a fee. In order to tax a leasehold estate as property, the statute must require the owner of any estate in land less than the fee to return it for taxes and pay taxes on it as on other property. By this means, the fee interest of the governmental body is severed from the leasehold estate, and the leasehold estate is classified as realty for tax purposes. *Delta Airlines, Inc. v. Coleman*, 219 Ga. 12, 131 S.E.2d 768 (1963), cert. denied 375 U.S. 904, 84 S.Ct. 195, 11 L.Ed.2d 145 (1963).

The Property Tax Code did not create this severance of the fee interest of the City and the leasehold interest of the taxpayers. For a collection of cases on the subject, see Annot: Comment Note: Availability of Tax Exemption to Property Held on Lease from Exempt Owner, 54 A.L.R.3d 402, § 15 et seq, "Exemption of lessee."

*Absent a specific exemption*, "It is generally held that the exemption from taxation enjoyed by governmental bodies with respect to lands owned by them does not extend to the leasehold interest of a tenant of those lands, . . . " (54 A.L.R.3d at 519). This conclusion is reached by various definitions of words in the statute and the language of leases. Exemptions are denied lessees where a statute expressly provides for taxation of land held under a lease, or for taxation of possessory interest, and as to improvements erected by a lessee on exempt property. See also, Annot: Property Tax: Exemption of Property Leased By and Used for Purposes of Otherwise Tax-Exempt Body, 55 A.L.R.3d 430 (1974).

The limitation in § 72–29–2.4, supra, is vague, ambiguous and uncertain in its meaning. If there is ambiguity or doubt, it is not the fault of the taxpayer and he should not be harassed by the language used in a statute. "Strict construction does arise against the state where the applicability of the tax statute is ambiguous or doubtful in meaning . . . " *Westland Corporation v. Commissioner of Revenue*, 83 N.M. 29, 32, 487 P.2d 1099, 1102 (1971)

A fair reading of the 1976 Act that created the imposition of property taxation of fractional interests, exempted the taxpayers of liability for such tax.

LOPEZ, Judge (specially concurring in part and dissenting in part).

Taxpayers appeal the order of the director (hereinafter referred to as the director) of the Department of Property Tax (the department), denying a protest of assessment and levy of ad valorem taxes on their leasehold interests in the Albuquerque International Airport (the airport). I would affirm in part and reverse in part.

The taxpayers present several points for reversal which can be considered as three issues on appeal: (1) constitutional and statutory tax exemptions should have been applied to the taxpayers; (2) certain inter-

ests of the taxpayers are not taxable; (3) the department used an incorrect alternative method of valuation. Unless otherwise noted, all statutory references are to the Property Tax Code, § 72–28–1 through § 72–31–93, N.M.S.A. 1953 (Supp.1975). Statutory references to the 1975 Interim Supplement will be designated by "Int. Supp."

### Constitutional and Statutory Issues Pertaining to Tax-Exempt Status

The taxpayers contend that their leases at the airport are not subject to valuation for property taxation purposes. It is therefore asserted that the action of the director of the department was contrary to law. The taxpayers challenge two conclusions of law made by the director: (1) taxpayers' fractional interests in the improvements located at the airport are not exempt by reason of § 72–29–2.4, (Int.Supp.) or Article 8, § 3 of the New Mexico Constitution; and (2) taxpayers' fractional interests in the improvements located at the airport are within the definition of "property" found in § 72–28–2 G, and taxpayers are "owners" of those fractional interests as defined in § 72–28–2 E.

Generally, the taxpayers argue that their interests are exempt from taxation because of Article 8, § 3 of the New Mexico Constitution, which states:

"The property of . . . towns, cities, . . . and other municipal corporations . . . shall be exempt from taxation."

Specifically, taxpayers argue for tax-exemption under § 72–29–2.4 (Int.Supp.) which reads in part:

"Fractional interests of nonexempt entities in real property of exempt entities are exempt from property taxation under the Property Tax Code . . . ."

I shall answer this argument first.

Under § 72–29–2 B(5), the department is authorized and is responsible for valuing all airline property subject to valuation for property taxation. Section 72–29–3 states that all property having a taxable situs in New Mexico is subject to valuation for tax-

ation except property exempted by the federal or New Mexico Constitutions, the Property Tax Code, or other laws.

Section 72–29–4 states in part:

"*Taxable situs—Allocation of value of property.*—A. Property has a taxable situs in the state if:

"(1) it is real property and is located in the state;

"(2) it is *an interest in real property* and the real property is located in the state; or

"(3) it is personal property and is physically present in the state on the date when it is required to be valued for property taxation purposes . . . ." [Emphasis added]

"Property" for purposes of the Property Tax Code is defined as " . . . tangible property, real or personal . . . " § 72–28–2 G. A "fractional interest" is defined as a "tangible interest in real property . . . that is less than the total of the interests existing in the property . . . ." Section 72–29–2.2 A (Int.Supp.). Thus, the taxpayers' leasehold interests in the airport could be classified as "fractional interests" because: (1) I accept the view that a lease is an interest in real property and is tangible personal property. *Ellison v. Ellison*, 48 N.M. 80, 146 P.2d 173 (1944); *State ex rel. Truitt v. District Court of Ninth Judicial Dist., Curry County*, 44 N.M. 16, 96 P.2d 710 (1939); *American Mortgage Co. v. White*, 34 N.M. 602, 287 P. 702 (1930); and (2) the taxpayers' leasehold interests fit the definition of a "fractional interest," i. e., one that is less than the total (fee) interest existing in the property.

I do not agree that the taxpayers' "fractional interests" or leasehold interests are exempted from taxation because of the last sentence of § 72–29–2.4 (Int.Supp.). Let us set out § 72–29–2.4 (Int.Supp.) in full:

"*Fractional interests—Improvements—Property tax status.*—Fractional interests of nonexempt entities in real property of exempt entities are exempt from property taxation under the Property Tax Code [articles 28 through 31 of Chapter 72].

*Nothing contained in this section shall affect the liability for tax of improvements located upon the real property of exempt entities."* [Emphasis added]

We believe that it was the intent of the legislature that "fractional interests" in improvements should be taxed. In enacting § 72–29–2.4 (Int.Supp.) the legislature specifically found that:

"It [the legislature] has legislative authority and should exercise it to impose the state's property tax on *improvements owned* or *used* by a non-exempt entity when the improvements are on the land of an exempt entity . . . ." [Emphasis added]

The taxpayers' "fractional interests" are in the *improvements* located at the airport. These leases are interests in real property as well as tangible personalty. *Yrisarri v. Wallis,* 76 N.M. 776, 418 P.2d 852 (1966), *State ex rel. Truitt v. Judicial Court of Ninth Judicial Dist., Curry County, supra; American Mortgage Company v. White, supra.*

The legislature has authority to exempt properties from taxation. See § 72–29–2.3 A(3) (Int.Supp.). Taxpayers argue that the first sentence of § 72–29–2.4 (Int.Supp.) gives effect to this legislative authority. I agree. But the taxpayers overlook the second sentence which states that nothing contained in the section exempting "fractional interests" shall affect the liability for tax on *improvements* located upon the real property of exempt entities.

Section 72–29–2.4 (Int.Supp.) must also be read in conjunction with § 72–29–2.3 B(1) (Int.Supp.). It was the expressed legislative purpose that:

"fractional interests of a nonexempt entity in real property of an exempt entity be exempted from property taxation *subject to the limitation contained in that section* . . . ." [Emphasis added]

The second sentence of § 72–29–2.4 (Int. Supp.) is the limitation referred to in § 72–29–2.3 B(1) (Int.Supp.). This language qualifies the exemption given to "fractional interests" by stating that the exemption: " . . . shall [not] affect

the liability for tax of improvements located upon the real property of exempt entities."

I do not think that §§ 72–29–2.2, 2.3 and 2.4 (Int.Supp.) are ambiguous or of doubtful meaning. The legislative intent is determined primarily from the language of an act. Judicial construction is not necessary unless there is ambiguity or doubt as to the meaning of the tax statute. *Till v. Jones,* 83 N.M. 743, 497 P.2d 745 (Ct.App.1972).

The Supreme Court, in deciding a case concerning an exemption for charitable institutions, stated: "The rule in New Mexico is that of reasonable construction, without favor or prejudice to either the taxpayer or the State, to the end that the probable intent of the [tax] provision is effectuated and the public interests to be subserved thereby are furthered." *Benevolent and Protective Order of Elks v. New Mexico Property Appraisal Dept.,* 83 N.M. 445, 493 P.2d 411 (1972). The legislative intent was to impose the State's property tax on the "fractional interest" of improvements, owned *or used* by a nonexempt entity, on the land of an exempt entity. Otherwise, nonexempt entities could readily circumvent the State's property taxes by leasing from an exempt entity. The taxpayers in this case are nonexempt and their leasehold interests are "fractional interests" in the improvements on the land of a tax-exempt entity. Therefore, property taxes are payable. *See Town of Atrisco v. Monohan,* 56 N.M. 70, 240 P.2d 216 (1952).

As to the argument that the taxpayers' interests are exempt under the New Mexico Constitution, this argument is answered by *Village of Deming v. Hosdreg Company,* 62 N.M. 18, 303 P.2d 920 (1956). The Supreme Court said:

"In reaching the conclusion he did the trial judge drew upon the language of Const. Art. VIII, § 3, exempting the property of the state and municipal subdivisions thereof, as well as bonds issued by them. There is nothing in the act exempting the defendant from ad valorem taxes on its leasehold interest, raw materials, stock and equipment. Nor are pri-

vate corporations absolved from payment of income, privilege or other excise taxes."

See generally, *Kirtland Heights, Inc. v. Bd. of County Comm'rs of Bernalillo County*, 64 N.M. 179, 326 P.2d 672 (1958); Muir, *Ad Valorem Tax Status of a Private Lessee's Interest in Public Owned Property: Taxability of Possessory Interests in Industrial Projects Under the New Mexico Industrial Revenue Bond Act*, 3 N.M.L.Rev. 136 (1973).

It is my conclusion that the leasehold interests of the taxpayers are not exempt.

In the next paragraph I shall discuss which "fractional interests" are taxable.

### The Interests of the Taxpayers Under the Lease Agreements

I have examined the voluminous lease agreements between the taxpayers and the city. It is my conclusion that the interests of all the taxpayers fall into two categories: leasehold interests and licenses. The lease agreements of all the taxpayers provide for: (1) the lease of specified areas of the improvements for which specified rents are paid; and (2) licenses to use the runways for which activity fees are paid. I do not intend to recite the terms of all the leases, but it will suffice to state the following facts:

The agreements of four taxpayers include the leasing of premises, facilities *and rights*. The demise clauses are almost identical in stating: ". . . Lessor does hereby demise unto Lessee, and Lessee does hereby hire and take from Lessor, certain premises, facilities and rights . . . ." The demised premises are described to include "common use" areas, ". . . landing areas, aprons, taxi ways, flood lights, landing lights, beacons, signals, radio aids, and other conveniences for flying, landing, and take-offs of aircraft of Lessee." The lease agreement for Continental Airlines separates the premises category into subcategories, the first two of which is termed: "Use of Airport and Facilities" under which the terms used are "rights" and "uses," and the second of which is termed: "SPACE IN AND ADJACENT TO AIRPORT TERMI-

NAL BUILDING". The leases of the four major airlines do not differ markedly from this arrangement and terminology.

In the case of two of the taxpayers, Southwest and Cutter, the two operators are given the right to sell fuel and aviation material.

All the taxpayers are charged specified rents for specified premises in the improvements of the airport. For the use of the airways, runways, etc., the airlines are charged activity fees and landing fees for landing purposes. As to Southwest and Cutter, they do not pay landing fees but merely perform a conduit function by collecting and remitting landing fees to the city in the form of a tax on aviation fuel. The city has characterized the money received for the sale of aviation fuel as fees instead of rent.

I believe that the taxpayers have leased premises for which they pay a fixed rent. As to these premises they have exclusive possession, control and dominion, having a "fractional interest" in the improvements of the airport.

As to the landing and activity fees, these are not rents but are payments for the use of the runways. The runways provide a place where the taxpayers have permission to operate their airplanes. In the case of Southwest and Cutter, they collect landing fees from their customers when they use the runways to sell fuel.

The department argues that under § 72–28–2 G property means tangible property, real or personal. The department argues that the interest of the taxpayers are properties under § 72–28–2 G. The department asserts that § 72–29–2.2 A (Int.Supp.), which defines a "fractional interest" in real property, would include all the interests of the taxpayer. This means that the department is arguing that the "fractional interests" includes licenses.

I believe that "fractional interests" include the leasehold interest, other property interests, but not licenses.

In the State of New Mexico it has always been the law that a leasehold interest, during its life, is equivalent to absolute ownership. *Yrisarri v. Wallis,* supra. The estate of the lessor, during the life of the lease, is limited to a reversionary interest which at the end of the lease ripens into perfect title. *Tri-Bullion Corp. v. American Smelting & Refining Co.,* 58 N.M. 787, 277 P.2d 293 (1954). A license, on the other hand, is a personal *privilege* to go upon land belonging to the licensor. It is permission to do acts upon another's land which would otherwise be trespass. It is not an interest in real property or improvements.

I have arrived at my conclusion not by looking merely at the form of the instrument. I look through the form of the agreements to determine their substance. Cf. *Helvering v. Lazarus & Co.,* 308 U.S. 252, 60 S.Ct. 209, 84 L.Ed. 226 (1939); *Gregory v. Helvering,* 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935). I have also followed the rule recently stated in *Kresge* that the substance of the instrument is not to be determined by its form but from the intentions of the parties as shown by the contents of the instrument. *S. S. Kresge v. Bureau of Revenue,* 87 N.M. 259, 531 P.2d 1232 (Ct.App.1976). In *Kresge,* the Court of Appeals defined license in its ordinary meaning as a permission to act. In this case, when the taxpayers are given the right to use the runways for landing purposes and to sell aviation fuel, this is nothing more than permission to land and permission to sell fuel.

It is undisputed that the taxpayers have no absolute ownership, absolute control or absolute dominion in the airstrips or facilities. However, in the specifically demised premises they do have exclusive control. 1 Tiffany Real Property § 79 distinguishes license and lease agreements:

"A tenancy involves an interest in the land passed to the tenant and a possession exclusive even of the landlord except as the lease permits his entry . . . . A mere permission to use land, dominion over it remaining in the owner and no interest in or exclusive possession of it being given, is but a license."

1 American Law Property § 3.3, says:

"At common law leaseholds were classified as corporeal or possessory interests, licenses, easements, and profits as incorporeal or non-possessory interests. . . *possession is the main feature which distinguishes a lessee's interest from a license, easement or profit.* The courts have continued to use the classification and the distinction. Possession, of course, is a variable term which might mean different things for different purposes, but it does imply physical control and intention to exclude others." [Emphasis added]

The case of *Henson v. Airways Service, Inc.,* 220 Ga. 44, 136 S.E.2d 747 (1964) presents similar facts. The Supreme Court of Georgia held that Airways Service, Inc., under a "Lease and Concession Agreement," obtained from a city no estate in the premises but only a license to use the premises for certain purposes under the control of the city. *Henson* cited Black's Law Dictionary, 3d ed. to define a license as ". . . authority to do a particular act or series of acts on land of another without possessing any estate or interest therein. . . ." Applying this definition, together with the principle announced in *Kresge,* we conclude that taxpayers obtained licenses. The licenses include the use of the airport runways, and the other facilities for the particular purposes stated in the contracts. I believe that taxpayers obtained only the right to use the land for the purposes as stated in the agreements, during the period specified in the agreements. *Henson v. Airways Service, Inc.,* supra.

An alternative holding which reaches the same results is that a license is precisely the type of "fractional interest" which is made exempt by § 72–29–2.4 (Int.Supp.).

It would have been much easier for the legislature to use such well-established words as "leasehold interest in improvements" or "license," rather than let us speculate on the meaning of "fractional interest," defined as something less than the fee.

On remand the department should determine those improvements upon which the taxpayers have a leasehold interest, separate from those areas upon which taxpayers have licenses. The leases of improvements are taxable but not the licenses.

### Alternative Method of Valuation

Section 72–29–5 B provides that the value of property, for taxation purposes, shall be determined by market value or comparable sales. If there is a lack of comparable sales or market data, the section provides for the use of an alternative approach, either cost or income methods of valuation.

"The department states, and the taxpayers accept, that no comparable sales data regarding taxpayers' interests are available." The taxpayers assert, however, five objections to the department's use of an alternative method of valuation. I shall consider these objections in order.

(1) *The method of valuation is not in accord with the department's regulations.*

The department's alternative method of valuation followed the method outlined in the Property Tax Department Regulations, P.T.D. Reg. 29–5:4. The method was modified to exclude the value attributable to land, in order to reflect only the value of improvements. Although the department is obligated to follow its regulations, *Martinez v. Health and Social Services Department*, (Ct.App.) 90 N.M. 345, 563 P.2d 608, decided 3/8/77, the aforementioned regulation was set aside by order of the New Mexico Court of Appeals. *Mapco, Inc. v. Property Tax Department of the State of New Mexico*, (Ct.App.) No. 2387, decided April 21, 1976.

For the first time, on appeal, the department asserts that the alternative valuation method is a cost method. The department's regulations define cost methods as:

". . . methods for valuing improvements . . . by determining the costs of *reproduction or replacement* of property with property which is as good as, but no better than, the improvements . . . being valued." [Emphasis original] P.T.D. Reg. 29–5:2

There is no evidence that the department used the replacement or reproduction cost as the alternative method. To the contrary, in the documents specifying the method which was used the department stated: "The method shown is believed by the Department to reflect an income method of valuation . . . ."

The taxpayer is entitled to know the method used for valuation. *In re First National Bank v. Bernalillo County Valuation Protest Bd.*, 90 N.M. 110, 560 P.2d 174 (Ct.App.1977). The department cannot change horses in mid-stream and assert for the first time on appeal that a cost method of valuation was used pursuant to a valid regulation. It is abundantly clear, and the department conceded below, that the method of valuation which was used is an income method determined pursuant to an invalid regulation. I go to the next point to determine whether the income method was appropriate and in accord with generally accepted appraisal techniques.

(2) *The taxpayer overcame the presumption that the valuation was correct.*

Whichever method of valuation is used, the valuation authority must apply generally accepted appraisal techniques. The burden is on the taxpayer, however, to show the department failed to determine value by any statutory or regulatory method. Otherwise, this Court has no way of knowing whether generally accepted techniques were used. *In re First National Bank v. Bernalillo County Valuation Protest Bd.*, supra.

The taxpayers must present evidence of value, based on expert testimony, to establish the generally accepted appraisal techniques which dispute the correctness of the department's valuation. In the instant case, the taxpayer did present such evidence. There is substantial evidence in the record to indicate a real dispute as to the accuracy of the department's valuation method.

The taxpayer overcame the presumption that the assessor made a correct valuation.

**232**

Section 72–31–6. The burden is on the department to prove the method of valuation is a generally accepted appraisal technique. *In re First National Bank v. Bernalillo County Valuation Protest Bd.*, supra.

(3) *The remaining conclusions are not substantiated by the evidence.*

The remaining points challenge several assumptions used in the alternative valuation method: a) the assumption that certain leases were for five years; b) the capitalization rate or interest rate did not consider risk factors; and c) the allocation of value between land and improvements was arbitrary.

I have already determined that the burden of explanation shifted to the department when the taxpayers presented expert testimony to refute the accuracy of the department's appraisal. I do not think that there is substantial evidence, either in the documents setting out its alternative method of valuation or in the testimony of the department's expert witness, to establish the accuracy of the appraisal. The department has not met the burden of establishing the use of generally accepted appraisal techniques. From the record and the director's order it is unclear how the department arrived at the three conclusions which the taxpayers challenge. The basis for these conclusions are obviously unclear to the taxpayers.

This court has recently held that the taxpayers are entitled to know the method of valuation which is used by the department. *In re First National Bank v. Bernalillo County Valuation Protest Bd.*, supra. For this reason, and the reasons expressed herein, the taxpayers should be granted a new hearing. The director will be required to choose an appropriate method of valuation, and to establish that the method is applied in accordance with statutory and regulatory methods of valuation and generally accepted appraisal techniques.

I add that these matters should be resolved in a written "decision" and order by the director, stating the reasoning of the director and the basis for his action. This

would facilitate an appeal if either party should deem it necessary. See *In re First National Bank v. Bernalillo County Protest Valuation Bd.*, supra.

The order and decision of the department should be affirmed in part and reversed in part, and the cause be remanded for proceedings consistent with my opinion.